**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **RICHARD BROWN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No. 10 C 2153** |
| **v.** ) | |
| ) | **Magistrate Judge Nan R. Nolan** |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Richard Brown (Brown) appeals from an ALJ's decision denying his claim for disability insurance benefits (DIB) and supplemental security income (SSI) benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Brown has filed for summary judgment. Because the ALJ's decision is not supported by substantial evidence, the denial of benefits is reversed and this case is remanded for further proceedings consistent with this opinion.

## I.    Factual Background

Brown applied for DIB and SSI in January 2006, alleging he became totally disabled on October 15, 2000, when he was 32 years old, because of back disorders and pain. (R. 167-81). Brown's insured status for DIB purposes expired on March 31, 2006, which means Brown had to show that he was disabled on or before that date to be eligible for DIB.

Brown was born on October 14, 1968 and has a history of migraine headaches, obesity, and back pain resulting from an injury in 2000. Brown graduated high school and also completed specialized training for truck driving. (R. 180-81). ALJ David W. Thompson rendered a decision finding that Brown was not disabled because he was capable of performing his past relevant work. (R. 43-54). The Appeals Council granted Brown's request for review and remanded the case to the ALJ. (R. 34-36). The ALJ held a second hearing on January 20, 2009 and heard testimony

from Brown and vocational expert ("VE") Dennis W. Gustafson. (R. 592-635). On March 26, 2009, the ALJ found that Brown was capable of performing his past relevant work as an assembler, fueler, and health and safety instructor. The ALJ also found that if Brown were limited to sedentary work, he could perform a significant number of jobs in the national economy, including hand packager, hand assembler, and/or information clerk. (R. 31). During the second administrative appeals process, Brown's attorney amended his alleged onset date to March 14, 2005. (R. 589). The Appeals Council denied Brown's request for review on February 23, 2010. (R. 7-9). Brown now seeks judicial review of the ALJ's second decision, which is the final decision of the Commissioner.

### A. Medical History

On December 6, 2002, Brown went to the emergency room because of lower back pain and increased numbness in the first three fingers of his right hand. (R. 362). Brown reported that the back pain radiated down his right leg. Id. Dr. Ramon Inciong, the emergency room physician, noted no history of herniated disc and diagnosed a lower back strain. Dr. Inciong treated Brown's back condition with Medrol Dosepak, Vicodin, muscle relaxants and Skelaxin. Id. Dr. Inciong also noted possible carpal tunnel syndrome of the right hand and recommended steroids and a wrist brace. Id. On January 2, 2003, Brown returned to the emergency room complaining of pain in his lower back and right testicle. (R. 361, 394). The doctor noted that Brown was in a minimal amount of stress. Id. Brown was given a 10 day prescription of Cipro and discharged. Id. In 2003, Brown successfully underwent a right and left carpal tunnel release. (R. 395-97).

On November 7, 2004, Brown reported to an emergency room complaining of back pain. (R. 391). An MRI of the lumbar spine was basically normal apart from minimal spondylotic change at the mid-lumbar level. (R. 392). The next day, Brown returned to the emergency room with his wife complaining of back pain of three days duration. (R. 302, 390). Brown also reported numbness and tingling down his left leg. Brown could "barely stand." Id. Brown was treated with

Toradol, Decadron, Demerol, Vistaril, Medrol Dosepak, Flexeril and Vicodin. Id. Following treatment in the emergency room, Brown was seen by Dr. Inciong for an examination on November 10, 2004. (R. 301). Dr. Incoing diagnosed lower back strain which appeared to be musculoskeletal in nature. Dr. Incoing noted that there were no radicular signs or symptoms and prescribed Prednisone for 12 days. Id.

On January 10, 2005, Brown sought treatment at the emergency room at Illinois Valley Community Hospital for ear and back pain. (R. 272-78). Brown was able to bend, flex, extend, and side bend "without much difficulty." (R. 278). He had good reflexes and was neurovascularly intact. Id. Brown stated that he "really [did] not have much pain" but ran out of his Flexeril and only had two Vicodin pills left. (R. 276, 277). Brown admitted that he was really just looking for medication refills. (R. 276). The emergency room physician did not believe Brown had an ear infection. The physician gave Brown a prescription for Ultracet and Flexeril and also a Toradol shot which gave him some relief. (R. 278).

On January 12, 2005, Brown sought treatment for low back pain when he went to the emergency room at St. Margaret's Hospital. (R. 295-300, 388-89). Brown also reported having severe low back pain extending to his lower extremities and pain in his testicle which both started in January 2004. (R. 296). The emergency room physician noted that Brown was extremely obese. Brown's weight was in excess of 300 pounds. Id. Brown was given Darvocet to take every six hours as needed and recommended to follow-up with Dr. Incoing. (R. 300).

An MRI of Brown's lumbar spine on January 19, 2005 indicated small central disc herniation at L4/L5 which causes moderate mass effect on the anterior thecal sac, moderate narrowing of the left and severe narrowing of the right neural foramina, and disc bulge degenerative changes at multiple levels. (R. 250). On March 1, 2005, Dr. Patrick Tracy, a neurosurgeon, saw Brown for left sided hip and thigh pain and right testicular pain. (R. 251). Brown told Dr. Tracy that he had had 15 years of pain in the left hip and thigh with referred pain into the right testicle, which had been

appreciably worse for the last six months. (R. 252). Brown reported that he had trouble sitting which he did for longer periods of time as a truck driver. Id. Dr. Tracy reviewed two MRIs of the lumbar spine. One MRI was from 2000 and the other MRI was done about a month before in 2005. Id. Dr. Tracy opined that both MRIs were "normal." Id. Dr. Tracy noted some degenerative changes at multiple levels and tiny disc bulges at several levels but there was no evidence of any disc herniation, spinal stenosis, spondylolisthesis, or neural compression. Id.

On physical examination, Dr. Tracy noted that Brown had full, nonpainful range of motion in his back and no tenderness or deformity. (R. 253). Dr. Tracy also found leg length discrepancy, right one inch shorter than left, positive straight leg raise maneuver at about 60 degrees on the left, cross straight leg raising causes some pain, pain with internal and external rotation of the hip and with flexion of the left hip, some tenderness with palpation of the left gluteal musculature, and some tenderness on palpation with multipennatus and erector spinae on the left side. Id. Dr. Tracy's assessment and plan noted the following: (1) chronic myofascial pain syndrome involving predominantly left low back and hip girdle; (2) Brown was not an appropriate candidate for surgical treatment given normal MRI; (3) leg length discrepancy may be a perpetuating factor and gave Brown a lift for his right shoe; (4) gave Brown back and lower extremity exercises for strengthening and flexibility; and (5) recommended a sleep study because sleep apnea may be a second perpetuating factor. Id.

On March 14, 2005, Brown presented at the emergency room at St. Margaret's Hospital complaining of lower back pain of one month's duration. (R. 290-93, 386-87). Dr. Incoing noted that Brown reported pain radiating down the left buttock area and down towards his knees and into the right testicle. (R. 293). Dr. Incoing wrote that Brown's complaints did not "make sense." Id. Dr. Incoing noted that he planned to review Brown's MRI and gave Brown a shot of Demerol, Vistaril, and Decadron shot. Id. Dr. Incoing planned to refer Brown to a different neurosurgeon at Loyola University for his back pain. (R. 387).

On March 18, 2005, Brown was seen by Dr. Incoing complaining of "a lot of pain in his lower back." (R. 289). Dr. Incoing noted that Brown's MRI showed a small disk herniation but commented that Brown was "quite symptomatic." Id. Dr. Incoing referred Brown to Dr. Alexander Ghanayem, a spine specialist at Loyola University Health System, to determine if he is a surgical candidate. If not, Dr. Incoing recommended an epidural steroid injection and gave him prescriptions for Relafen, Flexeril, and Vicodin. Id.

On April 8, 2005, Dr. Ghanayem examined Brown at the request of Dr. Incoing for back pain. (R. 254). Dr. Ghanayem indicated that Brown was taking Vicodin for pain. Id. Dr. Ghanayem noted normal posture and gait, tenderness over the SI joint on the left, provocative tests for SI joint pain positive on the left and negative on the right, range of motion limited secondary to back pain, and neurologically nonfocal. Id. Dr. Ghanayem also noted that the MRI of the lumbar spine revealed multi-level degenerative changes but no significant stenosis on the left side. Dr. Ghanayem's impression was multi-level lumbar spondylosis as well as SI joint dysfunction. Id. Dr. Ghanayem described Brown's condition as a "nonsurgical problem." Id. Dr. Ghanayem recommended a fluoroscopic-guided SI joint injection, reentering physical therapy for trunk stabilization exercises, and a prescription for Lodine instead of a long-term narcotic. Id.

On May 6, 2005, Brown went to the Illinois Valley Community Hospital emergency room complaining of back pain at a level of 8 out of 10. (R. 260-65). The emergency room physician noted deep tendon reflexes difficult to elicit, tenderness to lower lumbar and left paraspinal area, and decreased active range of motion at the waist. (R. 261). Brown was given Toradol, Visaril, Nubain, and Valuim in the emergency room for pain relief but it was unclear whether Brown had any real significant pain relief. (R. 262). Brown returned home to try to get some relief and was given a referral to a pain clinic and prescription for Flexeril and Lodine. Id.

On May 9, 2005, Brown presented at the St. Margaret's Community Health Clinic complaining of "a lot of pain in the lower back that is persistent." (R. 288). Brown reported receiving several injections in the emergency room the day before which did not help much with his pain. Id. Brown described the pain as going into the right side of his groin into the testicle and on the left behind the buttocks down to the level of the knee. Id. Dr. Incoing noted that Brown's back "shows a lot of tenderness." Id. Dr. Incoing referred Brown to Dr. Deofil Orteza for an epidural steroid injection. Id.

Brown was seen by Dr. Orteza at the Bureau Valley Interventional Pain Management Clinic on June 1, 2005. (R. 318-20). Brown reported pain at a level of 5 out of 10 most of the time. (R. 318). Brown stated sitting aggravated his pain, standing and walking relieved the pain, and laying flat relieved the pain. Id. Dr. Orteza noted that an MRI showed small central disc herniation at L4/5 which caused moderate mass effect on the anterior thecal sac, moderate narrowing of the left foramina, severe narrowing of the right neural foramina, and disc bulge degenerative changes at multiple levels, L3/4, L4/5 and L5/S1. Id. Dr. Orteza's impression was left posterior SI joint pain, most likely secondary to osteoarthritis of the left SI joint. (R. 319). Dr. Orteza recommended a series of left SI joint injections. (R. 320). On June 3, 2005, Brown received a diagnostic/therapeutic SI joint injection for left low back pain. (R. 284-87). On June 17, 2005, Brown reported at least 50% improvement of his pain and received another left sacroiliac joint injection at St. Margaret's Hospital in Spring Valley, Illinois. (R. 281).

On January 25, 2006, Brown saw Dr. Inciong complaining of severe pain in his lower back. (R. 280). Dr. Inciong noted that he had seen Brown two months earlier, put him on a Medrol dose pack, Vicodin, and Flexeril, and gave him a steroid injection in the sacroiliac joint at that time. Id. Dr. Inciong observed that Brown's pain seemed to be worse. Dr. Incoing gave Brown a prescription for Oxycontin and Vicodin until Dr. Orteza could do an epidural steroid injection. Id.

On February 24, 2006, Brown returned to Dr. Incoing. (R. 279). Brown reported persistent pain in his lower back. Id. Dr. Incoing noted that Brown's lumbar radiculopathy/chronic low back pain was a chronic problem. Id. Dr. Incoing also stated that a previous round of epidural steroid injections had helped. Id. Dr. Incoing recommended another round of epidural steroid injections and refilled Brown's prescriptions for Oxycontin, Flexeril, and Vicodin. Id.

On February 13, 2006, Brown was seen again by Dr. Orteza at the pain clinic. (R. 309-17). Brown reported a one year history of low back pain, with radiation down to the posterior aspect of his left thigh and lately, also radiating into the right posterior thigh. (R. 309). Dr. Orteza recommended a series of lumbar epidural steroid injections . (R. 311). Brown received his first injection on February 13, 2006. (R. 314). Brown returned to the pain clinic for a follow-up visit two weeks later and reported a 20% to 30% improvement of his pain. (R. 306). Brown was treated with a second steroid injection on February 27, 2006. On March 13, 2006, Brown reported a 50% to 60% improvement of his pain. (R. 303). He reported being able to sit longer, increase his activity, and tolerate walking without much discomfort. Id. Because Brown still experienced significant low back pain, he received a third lumbar epidural steroid injection. (R. 303-06).

On March 27, 2006, Brown visited Dr. Inciong complaining of bad headaches that had been occurring over the past month. (R. 377). Dr. Inciong noted that the cause of the headaches was unclear. Id. Dr. Inciong stated that the headaches did not appear to be from the sinuses, there were no neurologic defects, blood pressure normal, no meningeal signs, and no fever or chills. Id. Dr. Inciong gave Brown samples of Relpax for his headaches. Id. With regard to Brown's low back pain, Dr. Inciong noted: "The patient is getting some relief. It is not a whole lot better though, but it is not getting any worse. He needs to complete the course of treatment with Dr. Orteza." Id.

On March 31, 2006, Dr. Sandra Bilinsky, a state agency physician, reviewed Brown's treatment records to assess his residual functional capacity. (R. 321-28). Dr. Bilinsky opined that Brown could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand

and/or walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday.  (R. 322).  Dr. Bilinsky also concluded that Brown could occasionally climb stairs or ramps and occasionally balance, stoop, kneel, crouch, and crawl.  (R. 323).  Dr. Bilinsky found that Brown could never climb ladders, ropes, and scaffolds.  Id.  Dr. Bilinsky opined that Brown should avoid concentrated exposure to hazards like machinery and heights.  (R. 325).  In her assessment, Dr. Bilinsky commended that a lumbar epidural steroid injection had improved Brown's pain by 50-60 percent which had allowed him to sit longer and increase his activity.  (R. 328).  Dr. Bilinsky also noted that Brown had normal gait, straight leg raise test was negative bilaterally, no neurological abnormalities, no sensory or motor abnormalities, deep tendon reflexes normal, and able to do heel/toe movement.  Id.

On April 18, 20, 22, and 24, 2006, Brown received chiropractic treatment for his low back pain.  (R. 398-401).  Brown again saw Dr. Inciong on May 31, 2006.  (R. 350-51, 375-76).  Brown reported that his back pain was "still quite severe" but his headaches were much improved since taking Relpax.  (R. 350, 375).  Brown stated he had completed a series of epidural steroid injections and got some back pain relief.  Id.  Brown also indicated that he had seen a chiropractor when he could afford it.  Dr. Inciong noted that Brown reported temporary pain relief from the chiropractor visits but the pain relief did not seem to be long lasting.  Dr. Inciong also noted that Dr. Ghanayem from Loyola had told Brown that he was not a surgical candidate.  Id.  Dr. Inciong refilled Brown's prescriptions for Oxycontin, Vicodin, Relafen, and Flexeril.  (R. 350-56).  Dr. Inciong noted that Brown had not shown any signs of abusing the Oxycontin.  (R. 350, 375).

On November 1, 2006, Brown met with Dr. Philip Budzenski for a consultative examination.  (R. 330-34).  On physical examination, Dr. Budzenski noted that Brown ambulates with a wide-based gait appropriate for his body habitus, his gait was not unsteady, lurching, or unpredictable, and he did not require ambulatory aid.  (R. 331).  Dr. Budzenski further noted that Brown was able to get on and off the examination table without difficulty, was stable at station, and appeared

comfortable in the seated and supine positions. Id. Dr. Budzenski's examination of Brown's cervical spine revealed no tenderness in the spinous processes or paravertebral muscle spasm, flexion normal to 50 degrees, extension limited to 40 degrees, lateral bend limited to 30 degrees, rotation preserved to 80 degrees bilaterally, and mild soft tissue tenderness to palpation of the left upper trapezius muscle. (R. 332). Examination of the dorsolumbar spine showed no apparent kyphosis or scholiosis, no paravertebral muscle spasm or tenderness to palpation of the spinous processes, forward flexion limited to 60 degrees, extension limited to 15 degrees, lateral bend normal to 25 degrees bilaterally, straight leg raising test normal to 90 degrees bilaterally in the seated position, and straight leg raising in the supine position negative to 45 degrees bilaterally. Id. Dr. Budzenski noted that Brown reported taking Oxycontin, Flexeril, an anti-inflammatory, and "the highest" dose of Vicodin eight times per day. (R. 330). Dr. Budzenski's impression was lumbago (lower back pain), allegation of narcotic habituation and overuse, hearing loss apparently improved with hearing aid, and morbid obesity. (R. 334). With regard to the work place, Dr. Budzenski concluded that Brown may need to be able to change from a seated to a standing position. Id. Dr. Budzenski stated that given the allegation of narcotic habituation, Brown should not operate automotive equipment, dangerous equipment, climb ladders, ropes, or scaffolding, or work around unprotected heights. Id. Otherwise, Dr. Budzenski found that Brown could perform medium work eight hours a day. Id.

State agency physician Michael Nenaber assessed Brown's physical residual functional capacity on November 29, 2006. (R. 115-16; 335-342). Dr. Nenaber found that Brown retained the residual functional capacity to occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. (R. 336). Dr. Nenaber also found that Brown had no push/pull, postural, manipulative, visual, communicative, or environmental restrictions. (R. 336-39). Dr. Nenaber noted that Brown had a limited range of motion of his lumbar spine with flexion limited to 60 degrees and

extension limited to 15 degrees but straight leg raising was normal, ambulation was without a device, and there was no significant muscle weakness or neurological concerns. (R. 342).

On December 8, 2006, Brown sought treatment at the emergency room at St. Margaret's Hospital for a migraine headache. (R. 378-84). Brown reported a severe migraine headache on the left side for the last 4 days. (R. 380). Brown was treated with Compazine and Benadryl in the emergency room and then discharged. (R. 381).

At a follow-up appointment with Dr. Inciong on February 19, 2007, Brown continued to complain of severe pain in his lower back. (R. 374). Dr. Inciong referred Brown back to Dr. Kloc. Id. Dr. Inciong hoped that a nerve block might help with Brown's back pain. Id. On that same day, Dr. Inciong issued a letter stating that Brown had been having problems with severe pain in his lower back for over a year. (R. 373). Dr. Inciong noted that an MRI indicated that Brown had a herniated disc. Id. Dr. Inciong also stated that Brown had been evaluated by several neurosurgeons, orthopedic surgeons, and at various different pain clinics. Dr. Inciong noted that Brown was not a surgical candidate. Dr. Inciong indicated that Brown had become dependent on narcotics but had successfully weaned himself off of narcotics. Id. According to Dr. Inciong, Brown's physical examination was significant for persistent tenderness in the lower lumbar area and the left sacroiliac area, straight leg test on the left side, and decreased sensation to fine touch. Id. Dr. Inciong noted, however, that Brown's deep tendon reflexes remained intact, there was no evidence of cord compression, and Brown could control his bowels and bladder. Id. Dr. Inciong concluded that Brown is in constant pain, gets only minimal relief from medication, and feels better when standing. Id. Dr. Inciong opined that Brown is totally disabled. Id.

On May 2, 2007, Brown underwent five nerve root injections and a radiofrequency ablation procedure in the lumbar spine. (R. 371). On July 16, 2007, Dr. Inciong noted that the five nerve root injections and radiofrequency ablation procedure did not provide Brown with any significant improvement. (R. 370). Dr. Inciong stated that Brown continues to have constant pain in his lower

back that radiates down into his left thigh and right testicle.  Id.  Dr. Inciong further stated that Brown's constant pain causes him a lot of difficulty sleeping at night, which results in chronic fatigue.  Id.  Dr. Inciong wrote that the only position that provides Brown with any relief form his back and leg symptoms is lying on his back with his feet elevated.  Id.  Dr. Inciong noted that Brown also continued to experience migraine headaches once to twice per month which result in him being incapacitated for an entire day.  Id.  Dr. Inciong concluded that in his opinion, Brown is disabled and has been so since October 2000.  Id.

On July 10, 2007, Brown was admitted to a hospital for an irregular heart rate.  (R. 489, 552).  Brown was treated with Cardizem, Lovenox, and Coumadin.  (R. 552, 554).  Brown was discharged on July 18, 2007 with prescriptions for Coreg, Coumadin, and Digozin.  (R. 557).  He was instructed to follow-up with his physician in two weeks and not to lift more than 25-30 pounds. (R. 557-58).

On July 20, 2007, Brown went to the emergency room at St. Margaret's Hospital, complaining that he could not move from the waste down.  (R. 472).  Brown also reported that the back of his legs burned.  Id.  The emergency room physician described Brown's symptoms as moderate and achy.  (R. 473).  The physician noted that Brown was morbidly obese and that he was unable to cough due to his excessive weight.  Id.  On physical examination, the physician observed that Brown's reflexes appeared to be within normal limits, he had mild tenderness when palpating along lumbosacral area bilaterally, gait appears to be normal, and sensory exam appears to be within normal limits.  Id.  The physician indicated that Brown has difficulty "living without assistance."  Id.  Brown was discharged the same day and given a prescription for Prednisone. (R. 478).

On July 21, 2007, Brown returned by ambulance to the hospital for complaints of severe pain radiating down both legs.  (R. 364-69; 430-69).  When the paramedics arrived at Brown's home, he rated his pain at a level of 20 out of 10 and then in the ambulance at a 10 out of 10.  (R.

464-65).   Dr. Inciong noted that Brown has had chronic back pain and has seen different physicians. (R. 368).  Most recently, Dr. Kloc had treated Brown with epidural steroid injections and radiofrequency ablation treatments.  Id.  Brown reported that these treatments were starting to help relieve his back pain when three days before, the pain suddenly became more severe again.  Id. Dr. Inciong recommended an MRI and IV Deadron and Morphine PCA (patient-controlled analgesia) to get the pain under control. (R. 369).  Dr. Inciong noted that Brown admitted to having been addicted to Vicodin but successfully went through detox. (R. 368).  Dr. Inciong further noted that he had been trying to avoid treating Brown's back pain with a narcotic.  (R. 368-69).  Dr. Inciong wrote: "We have done everything that we could and now it seems to be worse and we have no other choice but to use them again."  (R. 369).

Brown could not fit into the MRI tunnel at St. Margaret's Hospital.  (R. 431, 445).  On July 24, 2007, Brown was transferred by ambulance to Perry Memorial Hospital for an MRI and then returned to St. Margaret's Hospital.  Id.  Dr. Inciong reviewed the MRI and noted there was a "significant change from the previous MRI done about 3 years ago." (R. 431).  Dr. Inciong noted that the recent MRI showed a large central and left paracentral disc herniation with extruded disc material extending inferiorly and effacing the left thecal sac and nerve roots at the L4-5 level.  Id; (R. 564-65).  Dr. Incoing noted that he planned to discuss Brown's condition with Dr. Ghanayem to see if he was a possible surgical candidate in light of the recent MRI.  Id.  Brown was discharged on July 26, 2007 on oral medications.  Id.  On discharge, Brown's pain was fairly controlled.  Id. Brown was also prescribed a cane, elevated leg rest, and a wheelchair.  (R. 421, 424).

On August 24, 2007, Brown saw Dr. Ghanayem. (R. 100).  Dr. Ghanayem noted that Brown had developed "severe left sided leg pain" three weeks before.  Id.  Dr. Ghanayem observed that Brown's pain "was much worse than he has ever been with chronic low back symptoms" and that he was "having some difficulty walking because of his pain."  Id.  Dr. Ghanayem noted positive tension sign on the left with crossed straight leg raise on the right.   Dr. Ghanayem reviewed

Brown's MRI scan and diagnosed a "rather large extruded disk herniation at the L4-5 level with severe canal stenosis." Id. Dr. Ghanayem advised Brown to try one additional left sided L4-5 transforaminal injection to see if it would break the pain cycle. If not, Dr. Ghanayem recommended a lumbar laminectomy and diskectomy at the L4-5 level. Id.

On September 4, 2007, Brown underwent a L4-5 laminectomy with left sided partial medial facetectomy and diskectomy at Loyola University Medical Center. (R. 99). Before the surgery, Dr. Ghanayem noted that Brown had "severe canal stenosis and intractable leg pain from a very large disk herniation at the L4-5 level causing stenosis." (R. 99a). During surgery, Dr. Ghanayem observed that the "dura was quite tense and tight." (R. 99). Dr. Ghanayem used a nerve probe "to sweep underneath the dura and extract a very large free fragment of disk." Id. Afterwards, "the dura had essentially no tension on it and the nerve root was fully mobilized." Id.

On September 25, 2007, Brown presented at the emergency room of St. Margaret's Hospital in Spring Valley, Illinois complaining of "increasing pain and numbness going down the left leg." (R. 97). Dr. Inciong evaluated Brown and noted that Brown had a laminectomy at the L4-5 area three weeks before that went well. Id. Dr. Inciong noted that after the surgery, Brown continued to feel some pain in his lower back going down his leg but that the pain was not as "bad as it was before." Id. Dr. Inciong further noted that Brown's "pain seemed to be easing up and was controlled on medication but today he is starting to notice increasing tingling going down the legs and numbness." Id. Dr. Incoing observed swelling in Brown's legs, profound episodes of shortness of breath, and a "little bit" of tachycardia in the emergency room and sent Brown for a spiral CT scan of the chest. Id. The CT scan revealed a pulmonary embolism in the left main artery and several smaller segmental branches. Id. Brown was admitted to the intensive care unit and started on Heparin followed by Coumadin. (R. 98). Brown was discharged on September 28, 2007 in "improved condition" and given Lovenox as an outpatient for several doses to ensure that his blood was well anti-coagulated. Id. On discharge, Dr. Incoing noted some edema but stated that Brown

was "doing well otherwise." Id.

Brown saw Dr. Anthony Brown, an orthopedic surgeon, for a consultative examination on September 29, 2008. (R. 105-07). In his report of that visit, Dr. Brown indicated that Brown complained of pain in the lower back radiating into the left leg and numbness in the left foot. (R. 105). He also noted that Brown stated that bending and lifting increased his discomfort and his pain is relieved with sitting. Id. Dr. Brown noted that he reviewed the medical history which revealed migraine headaches and bilateral carpal tunnel surgery. (R. 106). Dr. Brown noted that Brown was 5'7" and weighed 370 pounds. Id. Brown was "able to arise directly out of a chair without significant use of his upper extremities." Id. On physical examination, Dr. Brown noted normal gait, no spasm or scoliosis of the lumbosacral spine, straight leg raising test moderately positive in sitting position, and flexion, abduction, and external rotation of hips unrestricted. Id. Dr. Brown reported that motion in Brown's back was "severely restricted" to 30 degrees of flexion, 10 degrees of right lateral flexion, 10 degrees of left lateral flexion, and 0 degrees of flexion. Id. Dr. Brown's neurologic examination of the lower extremities revealed physiologic reflexes, no pathologic reflexes, a stocking type sensory decrease on the left, motor exam negative, and measurements of thighs, calves, and leg lengths equal. Id. Dr. Brown diagnosed chronic low back pain, status post lumbar laminectomy, and morbid obesity. Id. He recommended weight reduction and home exercise program. (R. 107).

As part of his examination, Dr. Brown prepared a physical residual functional capacity assessment of Brown dated September 29, 2008. (R. 108-11). His assessment was based on the medical history and physical examination. Dr. Brown found that Brown could occasionally lift and/or carry 25 pounds; frequently lift and/or carry less than 10 pounds; stand, walk, and sit without limits; pushing/pulling affected in the lower extremities; occasionally climb stairs, balance, kneel, crouch, crawl, stoop; no climbing ladders or scaffolds; and unlimited ability to reach, handle, finger, and feel. (R. 108-10).

More than a month later on November 7, 2008, Dr. Brown wrote an "addendum" to his report of September 29, 2008 noting that he had reviewed his original report and stating: "It was noted on the report that there was a non-anatomic, stocking type sensory change. Not noted was that the patient was observed following the formal examination to have motion in excess of that during the formal examination. No other aberrations were noted." (R. 112). The record contains no explanation for why Dr. Brown's September 29, 2008 examination report did not contain the statements in his addendum, or what caused Dr. Brown to provide this addendum.[1]

On January 14, 2009, Dr. Inciong wrote a letter on behalf of Brown discussing his impression of Brown's impairments. (R. 113-14). Dr. Inciong noted that Brown continued to experience "severe incapacitating pain that prevents him from doing any meaningful work." (R. 113). Dr. Inciong reported that Brown's back surgery in September 2007 had not improved his condition. Dr. Inciong advised that Brown has constant burning sensation that extends from his lower back down to his left thigh and down to his knee and constant numbness and tingling of the entire leg which extends to his heel and toes and affects his balance. Id. Dr. Inciong stated that Brown has trouble bearing weight and often cannot feel his foot and is unsteady. Id. Dr. Inciong noted that Brown continues to experience incapacitating migraine headaches on the average of two to three times a month as well as "a lot of anxiety," occasional dizzy spells and shortness of breath, and difficulty concentrating. Id. Dr. Inciong noted that Brown has been prescribed "extensive amounts of medications to cope with his condition," including Flexeril, Vicodin, tramadol, and Relpax. (R. 114). Dr. Inciong recommended that Brown elevate his legs above his waist level as much as possible to reduce pressure on his lower back. Id. Dr. Inciong concluded that, in his opinion, Brown is disabled, unable to perform any meaningful work, and his disability will continue

---

[1] In his decision, the ALJ relied on Dr. Brown's addendum noting that the "record includes statements by Dr. Brown suggesting the claimant was engaging in possible misrepresentation with regard to his restriction of movement." (R. 23).

indefinitely.  Id.

On June 3, 2009, after the ALJ's second decision and before the Appeals Council's denial of the request for review, Dr. John J. Taraska examined Brown.  (R. 590-91).  Dr. Taraska noted that Brown weighed 380 pounds and was grossly overweight.  (R. 590).  Upon physical examination, Dr. Taraska found that Brown can bend 10-15 degrees without pain and up to 30 degrees with severe pain in his back.  (R. 591).  Dr. Taraska also noted that pin prick testing demonstrated marked loss sensation in left upper posterior thigh and moderate loss of sensation in the left lower leg and the right upper posterior leg.  Id.  Dr. Taraska noted that Brown's reflexes and arm and leg strength are normal.  Id.  Dr. Taraska's impression was a grossly overweight male with postoperative scarring and degenerative changes in the L4-5 and L3-4 areas.  Id.  Dr. Taraska recommended a "Lap Band" surgery for weight reduction if Brown could afford it.  Based on his review of the medical records and Brown's history, Dr. Taraska concluded that Brown had been disabled since at least March 14, 2005.  Id.[2]

### B.    Plaintiff's Testimony

At the January 20, 2009 hearing before ALJ David Thompson, Brown testified that he had constant pain in his low back and left leg, toes, and heel which is exacerbated by sitting a lot, standing a lot, or moving around a lot.  (R. 601).  Brown stated that he can sit for 20 to 30 minutes before his back starts hurting and the pain increases down his leg.  (R. 602).  Brown can relieve some of the pain by sitting in a recliner and elevating his legs waist high.  Id.  Brown testified that Dr. Inciong told him to elevate his legs as much as possible and he has been doing that for the last three to four years.  (R. 603, 607).  Brown stated that he tries to visit his father in a nursing home

---

[2]It is not appropriate for this Court to consider evidence which was not before the ALJ but which Brown submitted to the Appeals Council when the Appeals Council denied Brown's request for review.  Rice v. Barnhart, 384 F.3d 363, 366 n.2 (7th Cir. 2003).  Because this case is being remanded for other reasons, the ALJ shall consider the June 3, 2009 report from Dr. John J. Taraska on remand. (R. 590-91).

every day.  (R. 604).  Brown's mother drives him to the nursing home.  <u>Id</u>.  Brown can drive and if his mother is unable to drive, Brown will drive to the nursing home.  (R. 605).  Brown testified that he suffers from migraine headaches about three times a month.  <u>Id</u>.  When Brown gets a migraine headache, he has to lay in bed in a dark room until it passes.  (R. 606-07).  Brown said his migraines can last for a day and a half to two days.  (R. 606).  Brown testified that despite his prior addiction to Vicodin, Dr. Inciong was currently prescribing Vicodin for Brown because "[he] can't live without it."  (R. 617).  Brown explained that he had tired non-narcotic pain medication but it did not work.  (R. 618).  Brown told the ALJ that he had gone to a pain clinic on and off for two years before his back surgery in 2007.  (R. 620).

     **C.**    **Vocational Expert Testimony**

Dennis Gustafson testified at the January 20, 2009 hearing as a VE.  The ALJ asked the VE to consider a hypothetical individual of Brown's age, education, and experience who has the residual functional capacity to lift 25 pounds occasionally, less than 10 pounds frequently, no walking or standing restrictions, no sitting restrictions, limited to occasional pushing and pulling with the lower extremities, limited to occasional ramps, stairs, balancing, kneeling, crouching, crawling and stooping, no ropes, ladders or scaffolds, and no limitations in reaching, handling, fingering, or feeling.  (R. 632-33).  The VE testified that Brown could not perform his past relevant work of truck driver but could perform his prior work as a printed circuit board assembler.  (R. 633).  The VE further testified that such an individual could perform the work of an interviewer (2,715 jobs in Illinois), information and record clerk (3,845 jobs in Illinois), and general office clerk (12,705 jobs in Illinois).  The VE stated that there would be no jobs available if the hypothetical individual would average three unexcused absences per month or had to elevate their legs above waist height for most of an eight-hour work day.  (R. 633-34).

D.    **ALJ's Decision**

Under the familiar five-step analysis used to evaluate disability, the ALJ found that Brown had not engaged in substantial gainful activity during at least the twelve month period elapsing after October 15, 2000 (step one); his back disorders, obesity, and chronic headaches are severe impairments (step two); but that they do not qualify as a listed impairment (step three). (R. 20-21). The ALJ determined that Brown retained the residual functional capacity to perform a range of light work with the exceptions that he was limited to lifting up to 10 pounds frequently and 25 pounds occasionally, occasionally pushing and pulling with lower extremities, no climbing of ladders, ropes or scaffolds, occasional climbing of ramps and stairs, and occasional balancing, stooping, crouching, crawling, or kneeling. (R. 21). Given his RFC, the ALJ concluded that Brown was able to perform his past relevant work as an assembler, fueler, and health and safety instructor (step four). (R. 30). The ALJ further found that even if Brown was limited to sedentary work, there were a significant number of jobs available to him in the national economy, including hand packager (6,800 jobs in Illinois), hand assembler (4,600 jobs in Illinois), and/or information clerk (4,800 jobs in Illinois). (R. 31).

II.    **Discussion**

Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled within the meaning of the Act, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently gainfully employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, see 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is able to perform his former occupation; and (5) whether the claimant is unable to perform any other

available work in light of his age, education, and work experience. 20 C.F.R. § 404.1520(a) (2004); Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." Clifford, 227 F.3d at 868 (quoting Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. Stevenson v. Chater, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). An ALJ's credibility determination should be upheld unless it is patently wrong. Schaaf v. Astrue, 602 F.3d 869, 875 (7th Cir. 2010). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. Estok v. Apfel, 152 F.3d 636, 638 (7th Cir. 1998).

The ALJ denied Brown's claim at step four, finding that Brown retains the residual functional capacity to perform a range of light work. Even if Brown's RFC was further limited to sedentary work, the ALJ found Brown would not be disabled at step five. Brown raises four main challenges to the ALJ's decision: (1) the ALJ erred in not giving controlling weight to the opinion of Brown's treating physician, Dr. Inciong; (2) the ALJ's residual capacity finding did not adequately account for all the limitations in Brown's abilities; (3) the ALJ erred in evaluating Brown's credibility; and (4) the ALJ erred in concluding that Brown could perform his past relevant work as an assembler, fueler and health and safety instructor. Because the ALJ's decision to discount Dr. Inciong's opinion was not supported with adequate reasons, a remand for further proceedings is necessary.

At the outset, the Court notes that Brown initially alleged disability since October 15, 2000. After the ALJ's second decision and before the Appeals Council denied his request for review,

Brown amended his alleged onset date to March 14, 2005, which supports a finding that he had no disabling impairments prior to that time. Because the ALJ's second decision was issued prior to the date on which Brown amended his alleged onset date, the ALJ's decision was not specifically tailored to the relevant time period. On remand, the ALJ should consider the evidence of all of Brown's medical conditions as they relate to his amended alleged onset date of March 14, 2005.

### A.    Treating Physician's Opinion

Brown's first argument is that the ALJ erred in rejecting Dr. Inciong's opinion. A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with other substantial evidence." Hofslien v. Barnhart, 439 F.3d 375, 376 (7th Cir. 2006). An ALJ may discount a treating physician's opinion, however, when it is internally inconsistent or contradict's the opinion of a consulting physician. Schmidt v. Astrue, 496 F.3d 833, 842 (7th Cir. 2007). A claimant is not disabled simply because his treating physician says so. Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001). "The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." Id. (quoting Stephens v. Heckler, 766 F.2d 284, 289 (7th Cir. 1985)). It is the ALJ's duty to assigning weight to conflicting medical statements in the record. Young v. Barnhart, 362 F.3d 995, 1001-02 (7th Cir. 2004) (stating "weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do."); Brooks v. Chater, 91 F.3d 972, 979 (7th Cir. 1996) (indicating "it is up to the ALJ to decide which doctor to believe–the treating physician who has experience and knowledge of the case, but may be biased, or ... the consulting physician, who may bring expertise and knowledge of similar cases–subject only to the requirement that the ALJ's decision be supported by substantial evidence.").

Even if controlling weight is not given to a treating physician's opinion, it may still be afforded some weight by the ALJ. If a treating physician's opinion is not entitled to controlling weight, the ALJ considers several factors in determining the weight to give the opinion, including:

the length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, the degree to which the opinion is supported by medical signs and laboratory findings, the consistency of the opinion with the record as a whole, and whether the opinion was from a specialist. 20 C.F.R. § 404.1527(d)(2)-(5). Social Security Ruling 96-2p provides:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

S.S.R. 96-2p at 4. In the end, the ALJ must give "good reasons" for the weight he assigns the treating physician's opinion. 20 C.F.R. § 404.1527(d)(2); 20 C.F.R. § 416.927(d)(2).

Dr. Inciong has had a long treating relationship with Brown. Brown has been Dr. Inciong's patient since at least 2002 and has treated him on repeated occasions for various medical problems. (R. 362). On February 19, 2007, Dr. Inciong wrote a letter indicating that Brown suffered from a herniated disc and had been suffering from severe pain in his back for "well over a year now." (R. 373). Dr. Inciong noted that Brown had undergone evaluations by several neurosurgeons, orthopedic surgeons, and pain clinics and endured various treatments, including narcotic pain relievers. The physical findings identified by Dr. Inciong were persistent tenderness in the lower lumbar area and left sacroiliac area, straight leg test positive on left side, and decreased sensation to fine touch. Dr. Inciong noted that Brown gets only minimal relief from pain medication and the medications are also potentially sedating. Dr. Inciong recommending trying nerve blocks but opined that in the meantime, Brown was unable to work.

On July 16, 2007, Dr. Inciong wrote a follow-up letter indicating that Brown had also undergone a series of five nerve root injections and radiofrequency ablation procedure which did

not significantly improve his pain. (R. 370). Dr. Inciong stated that Brown continued to have constant pain in his lower back that radiates down into his left thigh and right testicle. Dr. Inciong noted that the constant pain was causing Brown sleep difficulties which was resulting in chronic fatigue. Dr. Inciong indicated that the only position which provided Brown with any relief from his back and leg symptoms is lying on his back with his feet elevated. Dr. Inciong also noted that Brown suffers from incapacitating migraine headaches one to two times per month. Dr. Inciong concluded that Brown is disabled because he spends most of the day with his feet elevated resting and napping.

Dr. Inciong wrote in a third letter dated January 14, 2009 that since his letters on February 19, 2007 and July 16, 2007, Brown "continues to experience severe incapacitating pain that prevents him from doing any meaningful work." (R. 113). Dr. Inciong noted that a July 24, 2007 MRI of the lumbar spine revealed a large central and left paracentral disc herniation at the L4-5 level and degenerative disc disease at the L3-4 and L5-S1 levels. Dr. Inciong noted that these findings were consistent with the chronic complaints of pain in Brown's lower back over the past several years. Dr. Inciong stated that Brown's back surgery on September 4, 2007 did not improve his condition. Dr. Inciong noted that Brown continues to experience chronic lumbar pain and radiculopathy, constant burning sensation that extends from his lower back down to his left thigh and down to his knee, and constant numbness and tingling of the entire leg down to his heel and toes. Dr. Inciong indicated that the constant numbness and tingling affects Brown's balance and he has trouble bearing weight. To reduce the pressure on his back, Dr. Inciong recommended that Brown elevate his legs as much as possible above waist level. (R. 114). Dr. Inciong stated that Brown's high levels of pain also cause him to have difficulty concentrating. (R. 113). Dr. Inciong further noted that Brown continues to suffer from migraines on average two to three times per month. Id. Dr. Inciong concluded that Brown is disabled. (R. 114).

The ALJ rejected Dr. Inciong's opinion, finding that Brown had no walking, standing, or sitting limitations in an 8-hour workday. (R. 20). The ALJ found that Brown could perform a range of light work with the following restrictions: lifting up to 10 pounds frequently and 25 pounds occasionally; occasional pushing and pulling with lower extremities; no climbing of ladders, ropes or scaffolds; and only occasional climbing of ramps and stairs, balancing, stooping, crouching, crawling or kneeling. Id. The ALJ relied on the opinion of Dr. Anthony Brown, the orthopedic consultative examiner, to support his RFC conclusion. (R. 27-28).

The ALJ was not required to give controlling weight to Dr. Inciong's statement that Brown was unable to work but he was obligated to explain his reasons for not giving weight to the portions of Dr. Inciong's reports dealing with Brown's limitations affecting his ability to work. The ALJ cited several boilerplate reasons for giving Dr. Inciong's opinion of disability less than controlling weight: (1) Dr. Inciong "relied quite heavily on the subjective report of symptoms and limitations provided by the claimant" while there exist good reasons for questioning the reliability of Brown's subjective complaints; (2) Dr. Inciong's "own reports fail[] to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled;" (3) Dr. Inciong's opinion "is without substantial support from the other evidence of record;" and (4) there are no corresponding treatment records referenced or included that could support Dr. Inciong's assessment. (R. 27, 28-29). The ALJ did not expressly assign a particular weight to Dr. Inciong's opinions.

Because these reasons provided by the ALJ for rejecting Dr. Inciong's opinion do not withstand scrutiny, the ALJ's decision to discount Dr. Inciong's assessment in favor of the consulting physician's opinion was not based on substantial evidence. First, the ALJ failed to discuss in detail Dr. Inciong's most recent letter dated January 14, 2009. (R. 28-29). Although an ALJ does not have to discuss every piece of evidence, he must discuss evidence that contradicts

his conclusion and explain why he discounted it.  <u>Golembiewski v. Barnhart</u>, 322 F.3d 912, 917 (7th Cir. 2003) (ALJ may not ignore entire line of evidence that is contrary to the ruling but must evaluate the record fairly);  <u>Kasarsky v. Barnhard</u>, 335 F.3d 539, 543 (7th Cir. 2003).  By failing to discuss in detail Dr. Inciong's January 14, 2009 letter, the ALJ failed to analyze key facts in regard to Brown's back symptoms.  The ALJ failed to perform any analysis of Dr. Inciong's opinions that Brown needs to "elevate his legs above waist level as much as possible to reduce pressure on his lower back," has constant numbness and tingling of his left leg which goes all the way down to his heel and toes which "affects his balance" and causes him "trouble bearing weight," and constant pain causes Brown difficulty concentrating.  (R. 113-14).  Because Dr. Inciong's letter dated January 14, 2009 contains important evidence which was not discussed in the ALJ's decision, the Court does not know whether the ALJ considered this favorable evidence supporting Brown's claim. The ALJ's failure to discuss Dr. Inciong's most recent letter in more detail does not give the Court confidence that he had appropriate reasons for rejecting the limitations Dr. Inciong noted and a remand is justified.  <u>Giles ex rel. Giles v. Astrue</u>, 483 F.3d 483, 488 (7th Cir. 2007) (requiring the ALJ to explain why strong evidence favorable to the claimant is overcome by the evidence on which the ALJ relies); <u>Zurawski v. Halter</u>, 245 F.3d 881, 889 (7th Cir. 2001).  The ALJ will have to explicitly consider the specific limitations noted in Dr. Inciong's latest letter in more detail on remand.

This is another troubling feature about the ALJ's assessment of Dr. Inciong's opinion.  The ALJ mischaracterized the record with regard to Dr. Inciong and the July 24, 2007 MRI.  The ALJ believed that Dr. Inciong did not review the July 24, 2007 MRI results.  (R. 27 stating "[t]he claimant's treating physician did not review the MRI results.").  In fact, Dr. Inciong noted on July 26, 2007 that the MRI which had been performed two days prior revealed a "significant change from the previous MRI done about 3 years ago."  (R. 431).  In his letter dated January 14, 2009, Dr. Inciong detailed the findings of the July 26, 2007 MRI and stated that the MRI findings "coincided with his physical findings and his chronic complaints of pain in his lower back that he has been

experiencing over the past several years." (R. 113). The ALJ's belief that Dr. Inciong did not have the benefit of the July 26, 2007 MRI which showed that Brown's condition had significantly worsened was inaccurate and makes the Court further wonder whether the ALJ even considered the details of Dr. Inciong's latest letter dated January 14, 2009.

The ALJ's statement that Dr. Inciong's opinions were based "quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported" is also not supported by substantial evidence. An ALJ can give less significance to a doctor's report based on a claimant's own statement about his functional restrictions. Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995); Ketelboeter v. Astrue, 550 F.3d 620, 625 (7th Cir. 2008) (holding "if the treating physician's opinion is . . . based solely on the patient's subjective complaints, the ALJ may discount it."). It is not clear, however, how the ALJ determined that Dr. Inciong relied heavily on Brown's subjective complaints. Nothing in Dr. Inciong's letters indicates that he relied quite heavily on Brown's subjective complaints. Dr. Inciong's letters establish that his opinions are based on Brown's medical history, MRIs, physical examinations, and treatment. Again, the ALJ's decision ignored the details of Dr. Inciong's January 14, 2009 letter which was based in large part on the July 24, 2007 MRI which revealed a large central and left paracentral disc herniation at the L4-5 level and degenerative disc disease at the L3-4 and L5-S1 levels. (R. 113). After describing the test results in detail, Dr. Inciong stated that "[t]hese findings coincided with his physical findings and his chronic complaints of pain in his lower back that he has been experiencing over the past several years." (R. 113). Moreover, Dr. Inciong previously noted that Brown has been evaluated by several providers and received numerous treatments over the years for his back pain, including pain medications, nerve root injections and radiofrequency ablation procedure, and finally, back surgery. (R. 370, 373, 113). Dr. Inciong reported that Brown's physical examination was significant for persistent tenderness in the lower lumbar area and the left sacroiliac area, straight leg test was positive on the left side, and he had

decreased sensation to fine touch. (R. 373). The ALJ failed to explain how these conclusions amount to reliance on Brown's subjective reporting. Thus, the ALJ's first reason for rejecting Dr. Inciong's opinion is not supported by substantial evidence.

The next reason given by the ALJ for not giving controlling weight to Dr. Inciong's opinion is that Dr. Inciong's reports fail "to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled, and the doctor did not address this weakness." (R. 27). An ALJ is not required to accept a doctor's opinion if it is "inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002). The ALJ did not specify what types of significant clinical and laboratory abnormalities he believed were necessary to support Dr. Inciong's opinion. Indeed, Dr. Inciong's January 14, 2009 letter pointed to the clinical and laboratory abnormalities contributing to his opinion: an MRI of the lumbar spine dated July 24, 2007 showing a large central and left paracentral disc herniation at the L4-5 level and degenerative disc disease at the L3-4 and L5-S1 levels. (R. 113). The ALJ did not explain how these objective findings are contrary to Dr. Inciong's assessed limitations. The ALJ's assertion that Dr. Inciong failed to address the clinical and laboratory abnormalities supporting his opinion is not supported by the record. As a result, the ALJ's second reason for rejecting Dr. Inciong's opinion is not based on substantial evidence. Another reason given by the ALJ for rejecting Dr. Inciong's assessment was that it was "without substantial support from other evidence of record." (R. 27). The ALJ does not support his statement with evidence. This boilerplate conclusion, without any analysis, fails to provide the required logical bridge between the evidence and the ALJ's conclusion. Terry v. Astrue, 5890 F.3d 471, 475 (7th Cir. 2009).

Finally, the ALJ's statement that he discounted Dr. Inciong's opinion of disability in his latest letter because "[t]here are no corresponding treatment records referenced or included that could support this assessment" misses the point. (R. 29). In his letter dated January 14, 2009, Dr. Inciong discussed the results of the July 24, 2007 MRI which revealed a large extruded disc

herniation at the L4-5 level (R. 564-65) and opined that the MRI findings supported the "chronic complaints of pain in his lower back that he had been experiencing over the past several years. " (R. 113). The MRI shows that Brown suffered from back pain, which ultimately required back surgery in September 2007. Brown's complaints of persistent back pain during the "several years" prior to the July 24, 2007 MRI find support in the treatment records and therefore Dr. Inciong's opinion could not be cursorily dismissed for lack of supporting treatment records.

Brown makes a related argument that the ALJ had an obligation to recontact Dr. Inciong before rejecting his opinions. An ALJ has a duty to develop a full and fair record. Thompson v. Sullivan, 933 F.2d 581, 585 (7th Cir. 1991). The applicable regulations require an ALJ to recontact a treating physician when the evidence received "is inadequate for [him] to determine whether [the claimant is] disabled." 20 C.F.R. §§ 404.1512(e), 416.912(e); see also SSR 96-5p (stating if "the adjudicator cannot ascertain the basis of the [treating source's] opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion."). The regulation also states that an ALJ will seek additional evidence or clarification when: (1) the report from the treating physician contains a conflict or ambiguity that must be resolved; (2) the report does not contain all the necessary information; or (3) the report does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. §§ 404.1512(e)(1), 416.912(e).

At the hearing on January 20, 2009, the ALJ questioned the sufficiency of Dr. Inciong's conclusion that Brown is disabled. (R. 595-97). The ALJ said: "I'm going to write the doctor a letter and have him be more specific with what he can state based upon diagnostics and that what your functional limitations are. You know, what leads him to the opinion." (R. 597). The ALJ further stated that he "need[ed] to get more information out of" Dr. Inciong. (R. 599). At the end of the hearing, the ALJ concluded: "I'm going to send that letter off to your doctor. I'm going to give him a chance to respond. After I get his response back I will then come to a decision." (R. 634).

Despite these statements, the ALJ failed to recontact Dr. Inciong. In light of his concerns and representations at the hearing, the ALJ should have contacted Dr. Inciong for further information or at the very least, explained why he failed to recontact Dr. Inciong in his decision. The ALJ's failure to recontact Dr. Inciong is exacerbated by his apparent disregard of the details of Dr. Inciong's most recent letter dated January 14, 2009.

The ALJ's failure to recontact Dr. Inciong was not harmless. A clarification from Dr. Inciong concerning his recommendation that Brown elevate his legs above his waist as much as possible to reduce pressure on his lower back could impact the disability determination. The second VE testified that if Brown had to elevate his legs above waist height most of an eight-hour workday, he would be precluded from substantial gainful employment. (R. 634). On remand, if after proper consideration of Dr. Inciong's opinion, including his latest report dated January 14, 2009, the ALJ cannot ascertain the basis for Dr. Inciong's opinion, then the ALJ should consider recontacting Dr. Inciong.

In light of these deficiencies in the ALJ's analysis of Dr. Inciong's opinion, this case will be remanded. Remand is necessary so the ALJ can explain his reasoning regarding Brown's unlimited abilities to stand, walk, and sit in light of Dr. Inciong's opinion that Brown needed to elevate his legs as much as possible, had balance problems, and experienced trouble bearing weight in accordance with the amended onset date. After proper consideration is given to the opinion of Dr. Inciong, the ALJ shall make new findings in the sequential evaluation process, including new credibility and RFC findings. The Court will not reach the specific remaining issues raised by Brown as they may be affected by the ALJ's resolution of the case on remand after reevaluating the opinion of Dr. Inciong, and if necessary, recontacting Dr. Inciong.

### B.    Additional Issues

In order to expedite resolution of this case on remand, the Court addresses certain additional issues raised by the record.  First, the ALJ found that the Brown's ability to engage in work activity after his alleged onset date was inconsistent with Dr. Inciong's opinion that he was disabled.  (R. 27).  Brown testified that since October 2006, he has taught first aid and CPR for the Red Cross approximately 15 hours per month.  (R. 28, 95, 609-10, 655-56).  Brown explained that he is basically in charge of running the DVD, operating the remote, reading out of the instructor's book, and answering any questions.   (R. 609-10, 622-24, 656).   Brown does not physically demonstrate any of the maneuvers.  (R. 626, 657).  Brown explained that the director of the American Red Cross has been very accommodating of his condition and limitations.  (R. 657). While working, Brown can sit, stand, and walk at will.  Id.  The director also provided Brown with a "big executive chair" which makes it more comfortable for Brown to sit.  Id.  Brown testified that his wife and the director set up the room and the mannequins for his classes.  (R. 656).  Brown also testified that despite his employer's accommodations and flexibility, it has been "very difficult" for him to work the 15 hours a month.  (R. 657).  Brown stated that when he finishes teaching a class, his legs hurt more, his toes are numb, and his heel aches.  (R. 610).

In evaluating Brown's work activity, the ALJ shall keep in mind that "employment is not proof positive of ability to work, since disabled people, if . . . employed by an altruist, can often hold a job."  Wilder v. Apfel, 153 F.3d 799, 801(7th Cir. 1998); Henderson v. Barnhart, 349 F.3d 434, 435 (7th Cir. 2003) (stating "the fact that a person holds down a job doesn't prove that he isn't disabled, because he may have a careless or indulgent employer . . . .").   "One can be unemployable, yet employed."   Wilder, 153 F.3d at 801.   Thus, on remand, when evaluating whether Brown's employment is inconsistent with Dr. Inciong's opinion and Brown's testimony regarding his limitations and pain, the ALJ shall specifically consider the accommodations that Brown's employer

has offered as well the on-the-job assistance provided to him by wife.

Next, the ALJ discounted Brown's testimony regarding the severity of his symptoms because "[a]lthough the claimant testified he does not sit in any other chair but the wheelchair, the claimant testified [he] has a driver's license and had driven a few days prior to the hearing." (R. 28). There is no evidentiary basis for this finding. The Court has reviewed the transcript of the second hearing on January 20, 2009 and there is no mention of a wheelchair. (R. 592-635). Rather, Brown testified that he spends most of his day sitting in a recliner and elevating his legs. (R. 602-04). Brown's only testimony regarding use of a wheelchair was at the first hearing on July 27, 2007 and consisted of Brown stating that he had used only the wheelchair for sitting since it was prescribed the day before the hearing. (R. 648-50, 659). It is also not clear how Brown's ability to occasionally drive a car is inconsistent with his reports of pain and supports an ability to work eight hours a day five days a week. Carradine v. Barnhart, 360 F.3d 751, 755-56 (7th Cir. 2004) (holding ALJ improperly presumed that claimant suffering back problems could work because she could occasionally drive, shop, and do housework). The ALJ did not explain how Brown's ability to drive weakens his claim that he can sit for approximately 20 to 30 minutes before his backs starts hurting. (R. 602). Brown testified that he generally limits his driving to 10 to 15 miles and occasionally drives 15 to 20 minutes to visit his father in a nursing home. (R. 605).

Third, the ALJ questioned the reliability of Brown's subjective complaints because "[d]espite his allegations of disabling back pain and headaches, the foregoing record reflects that the claimant failed to even mention these impairments on numerous occasions." (R. 27). The ALJ cited five instances in more than a six-year period when Brown sought medical treatment for other conditions and did not mention back pain or headaches: (1) 9/4/02 – follow-up exam for chest pain; (2) 7/5/03 – infection of the ear canal; (3) 8/17/03 – skin rash after exposure to poison ivy; (4) 3/3/04 – ear infection; and (5) 4/22/05 – small ulcer and rash on feet. (R. 24-25, 271, 357-59, 363). The ALJ's finding in this regard is problematic because it ignores the rest of the record. As the

ALJ's decision acknowledges, Brown's allegations of ongoing complaints of back pain and headaches are well documented in the medical records. (R. 24-27). The fact that Brown did not complain of back pain and headaches every single time he visited a doctor over more than a six-year period does mean that he did not suffer from ongoing back pain and headaches. This is not a good reason for discounting Brown's subjective complaints and the numerous times he did complain of back pain and headaches. These five appointments are now of even more limited value because all but one pre-date the amended alleged onset date of March 14, 2005. Upon remand, in evaluating Brown's subjective complaints, the ALJ shall consider the medical record as a whole, including the ongoing effort by Brown and Dr. Inciong to relieve his back pain such as visits to specialists and pain clinics, a variety of pain medications, chiropractic treatments, epidural steroid injections and radiofrequency ablation treatments, and ultimately, back surgery. SSR 96-7p.

Over the years, Brown has been prescribed extensive amounts of medication to cope with his condition. In his February 19, 2007 letter, Dr. Inciong stated that Brown's medications are "potentially sedating" (R. 373). The ALJ did not consider the side effects from any of Brown's medications. On remand, in accordance with SSR 96-7p, the ALJ shall specifically address the possible side effects of any medications Brown takes to alleviate pain.

The ALJ further stated that he relied on Brown's "generally unpersuasive appearance and demeanor while testifying at the hearing" in making his credibility findings. (R. 28, 629-31). The ALJ emphasized that "this observation is only one among many being relied on in reaching a conclusion regarding the credibility of the claimant's allegations and the claimant's residual functional capacity." (R. 28). The ALJ noted that "claimant sat much longer during the hearing than he said he was capable of sitting (20 minutes), and rose easily with no signs of distress." (R. 23). In light of the concerns highlighted above regarding the ALJ's credibility determination and because the case is being remanded, the Court notes for remand that an ALJ's in-hearing

observation alone may not be the sole basis for a credibility determination. <u>Powers v. Apfel</u>, 207 F.3d 431, 436 (7th Cir. 2000) (expressing discomfort with the "sit and squirm" test yet refusing to find credibility determination patently wrong where the observation was one of several factors that contributed to the ALJ's determination).

Finally, there a number of misstatements by the ALJ which raise questions about how thoroughly and carefully the ALJ evaluated the record. First of all, the ALJ has an affirmative duty to ask the VE whether his testimony is consistent with the DOT. SSR 00-4p; <u>Prochaska v. Barnhart</u>, 454 F.3d 731, 735-76 (7th Cir. 2006). The ALJ stated in his decision that the vocational expert's testimony was consistent with the information contained in the Dictionary of Occupational Titles (DOT), but the ALJ did not ask the VE whether his testimony conflicted with the DOT. (R. 31, 631-35). Secondly, the ALJ stated he relied on the VE's testimony to find that Brown could perform his past relevant work as an assembler, fueler, and health and safety instructor. (R. 30). In fact, the second VE only testified that Brown could perform his past work as a printed circuit board assembler. (R. 633). Lastly, the ALJ stated he relied on the response given by the VE in concluding that Brown could perform a significant number of jobs in the national economy, including hand packager (6,800 jobs in Illinois), hand assembler (4,600 jobs in Illinois); and/or information clerk (4,800 jobs in Illinois). Again, this was not the second VE's testimony. The second VE testified that a hypothetical person with Brown's age, education, work experience, and the RFC limitations presented by the ALJ would be able to perform the positions of interviewer (2,715 jobs in Illinois), information and record clerk (3,845 jobs in Illinois), and general office clerk (12,705 jobs in Illinois).

## <u>Conclusion</u>

For these reasons, Plaintiff's Motion for Summary Judgment [24] is granted. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to

the Social Security Administration for further proceedings consistent with this opinion. The Clerk is directed to enter judgment in favor of Plaintiff Richard Brown and against Defendant Commissioner of Social Security. Given that this is the second time the ALJ in this matter has had his decision of nondisability reversed, this Court recommends that the Administration assign the case to a different ALJ on remand. See Sarchet v. Chater, 78 F.3d 305, 309 (7th Cir. 1996).

**E N T E R:**

_Nan R. Nolan_

**Nan R. Nolan**
**United States Magistrate Judge**

**Dated: January 30, 2012**